IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

SANDRA J. MURPHY,

  Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

  Defendant.

No. C13-0141

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

I.  **INTRODUCTION** ........................................ 2

II.  *PRINCIPLES OF REVIEW* ................................ 2

III. *FACTS* ................................................ 4
  *A.* *Murphy's Education and Employment Background* ........... 4
  *B.* *Administrative Hearing Testimony* ..................... 4
    *1.* *Murphy's Testimony* ............................ 4
    *2.* *Vocational Expert's Testimony* .................... 5
  *C.* *Murphy's Medical History* ............................ 6

IV. *CONCLUSIONS OF LAW* ................................ 18
  *A.* *ALJ's Disability Determination* ...................... 18
  *B.* *Objections Raised By Claimant* ...................... 20
    *1.* *Opinion of Treating Physician* .................... 20
    *2.* *Opinion of Counselor and Case Worker* ............. 23
  *C.* *Reversal or Remand* ................................ 26

V.  *CONCLUSION* ........................................ 26

VI. *ORDER* ............................................... 27

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Sandra J. Murphy on December 18, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Murphy asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Murphy requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*,

---

[1] On January 15, 2014, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the decision of the Administrative Law Judge ("ALJ") meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d

1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

### III. FACTS

#### A. Murphy's Education and Employment Background

Murphy was born in 1972. She has a bachelors degree in teaching, although her teaching experience is limited to three months of substitute teaching. Her work history consists primarily of being a pizza delivery driver, an office assistant, and a service support specialist with a telecommunications company.

#### B. Administrative Hearing Testimony

##### 1. Murphy's Testimony

At the time of hearing, Murphy was living with her mother. Murphy has a driver's license, but doesn't "drive a lot" and her mother drove her to the hearing. Murphy testified that she is 5 foot 7 inches or 5 foot 8 inches tall, and weighed 360 pounds, having "gained 160 pounds back in the past two-and-a-half years." (AR 38) Murphy testified that she used to walk regularly, but it was "really hard to keep on track" due to her depression.

According to Murphy, she suffers from "extreme social anxiety," and therefore would go on Facebook for social interaction. (AR 39) At times, she would be on Facebook up to 10 hours per day, although she told the ALJ that "I try not to spend that much time on the computer now." (AR 40) Murphy acknowledged that "I can use the computer."

4

Murphy testified that because she has "such disordered sleeping and eating and hygiene, I just can't even leave the house. I barely leave my room." (AR 40). According to Murphy, "I almost didn't get out of my bed for a year-and-a-half." Murphy told the ALJ, however, that "I feel a little bit more on the upswing now." (AR 40)

Murphy testified that she is treated by a psychiatrist, sees her counselor every six weeks, and has a "community support worker ("CSW"). The CSW comes to Murphy's house once a week and helps her with organizational tasks at home, such as paying bills and cleaning her room. Murphy was also involved in other programs at the Abbe Center.

When asked by her attorney what her most severe psychological problem was in her opinion, Murphy responded: "Probably just the physical side of the depression." (AR 44) Murphy testified that her low energy level made it difficult to interact with people and respond to their questions. Murphy testified that she would sleep all day and then have "horrible insomnia" at night. (AR 45)

In addition to depression, Murphy testified that she has panic attacks which she believes may be caused by anxiety over social situations. She limited her social activities to grocery shopping once or twice a month, usually late at night and with her mother. She stopped seeing friends from high school because she was "worried that they were talking about me and that they were having negative thoughts toward me, and they were trying to destroy my reputation or what have you." (AR 48)

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual

> who is capable of medium work as that term is defined in the
> DOT, and regulations; who is capable of performing . . .
> simple, routine tasks and simple work-related decisions with
> few workplace changes, with only brief and superficial
> interaction with the public and coworkers and occasional
> interaction with supervisors.

(Administrative Record at 56.)

The vocational expert testified that with such limitations, Murphy would not be able to perform her past work. The vocational expert testified, however, that she would be capable of performing the following jobs: (1) unskilled mail clerk, (2) photocopy machine operator, (3) collator operator, and (4) officer helper.

Murphy's attorney added additional restrictions, including missing more than four days of work a month, being unable to maintain attention for two-hour segments, needing to take unscheduled rest breaks two or three times each work day of 20 to 30 minutes each, and being unable to respond to changes in a routine work setting. The vocational expert testified that any one of those limitations would preclude competitive employment.

## C. Murphy's Medical History

Murphy has been treated almost exclusively at the Abbe Center for Community Mental Health in Cedar Rapids, Iowa. The first progress note in the administrative record is dated January 28, 2009, although she was apparently seen at the Abbe Center for at least a couple of years prior to that. When seen on January 28, 2009 by Dr. Collyer Ekholm, M.D., a staff psychiatrist at the Abbe Center, Murphy's mood was euthymic. Her affect was appropriate and "fairly full." Her speech was "of regular rate and rhythm, goal oriented, and logical." (AR 315) She said she was "depressed" by the fact that there were "so many young skinny women around," but Dr. Ekholm discussed with her that "this does not cause clinical depression and that citalopram will not help that." Dr. Ekholm decreased Murphy's prescription for citalopram to the amount which she had actually been taking per day.

While being followed by Dr. Ekholm, Murphy received counseling from Karen Penick, LISW, who was also employed at the Abbe Center. In a progress note dated February 2, 2009, Penick reported that Murphy's mood was "cooperative" and her affect was "appropriate." Murphy told Penick that she had "some anxiety and some

depression," but had no difficulties with sleep. (AR 314) At that time, Murphy continued to express an interest in teaching and was going to submit applications.

When seen again by Penick on March 11, 2009, Murphy was depressed and her affect was dysphoric. She reported an increase in appetite with subsequent weight gain, "which she feels depressed about." (AR 312) She had been sleeping a lot during the day because of her depression and her motivation was poor. Murphy also reported feeling sad regarding the end of a relationship with her male friend.

On March 25, 2009, Murphy met again with Dr. Ekholm. Apparently, Murphy had increased the dose of her medication because she started to have a return of panic attacks. (AR 311) Murphy's mood was euthymic, her affect was appropriate but somewhat restricted, and her speech was of regular rate and rhythm, goal oriented, and logical.

Murphy was apparently not seen again at the Abbe Center until her annual review on November 30, 2009. At that time, her mood and affect were depressed. Penick reported that Murphy "was weeping throughout today's session." (AR 308) Murphy was still grieving the loss of a relationship with her boyfriend and was upset that she had gained over 40 pounds of the weight which she had lost the previous year while on a weight loss program. She also discontinued her psychiatric medication as she thought that was possibly contributing to her weight gain. Murphy reported to Penick that her motivation and energy were "variable," and "when she feels significantly depressed, she will stay in bed all day." (AR 309) Murphy reported, however, that things were "going better" in her work life. She was promoted to shift manager at Pizza Hut and was working 25 hours a week. She had also started substitute teaching. It was agreed that she would see Dr. Ekholm and discuss getting back on some type of medication.

Murphy met with Dr. Ekholm on December 2, 2009. At that time, her mood was "somewhat apathetic" and her affect was "restricted." (AR 304) Murphy did not mention any difficulty with panic attacks, and denied the return of vegetative symptoms of

7

depression. Murphy acknowledged that she did not have the motivation to get up and exercise, which she attributed to attention deficit disorder.

On December 14, 2009, Murphy met with Penick and expressed frustration that she was not using her teaching degree and was making far less money than if she was teaching. Murphy reported that "she sometimes gets tired of the lack of professionalism in that type of environment [at Pizza Hut] as well as the drama." (AR 302) Murphy was "leaning" toward quitting her job at Pizza Hut and taking more substitute teaching jobs. Murphy stated that she had not had any recent panic attacks, although sometimes she experienced some depression and anxiety. Penick reported in her progress note that Murphy's "[a]ffect is somewhat restricted, although overall appears brighter." (AR 302)

When Murphy saw Penick on January 13, 2010, she reported that "she feels better now that she quit her job at Pizza Hut as she was having difficulty with a coworker." (AR 300) Murphy was trying to decide whether to work as a substitute teacher, or take an easier job which was less stressful. Murphy reported that she "has some days when she is quite depressed and anxious." Murphy stated that her "motivation is not bad, but she feels as though she is slow at everything she does." Her energy was described as "fair."

On January 29, 2010, Murphy was seen by Dr. Ekholm. In his progress note, Dr. Ekholm expressed frustration that Murphy increased her medication, but "[d]id not bother to share that decision with me other than to call up and demand that she be prescribed more medicine and that it be called in to the pharmacy." (AR 299) According to Dr. Ekholm's note, "I declined to do so stating that patient needed to do what everyone else does, which is come in and actually be seen." Murphy reported to Dr. Ekholm that "she feels like she's more energetic," and intended to go back to substitute teaching and make a decision about going to graduate school. At that time, her mood was euthymic, while her affect was "somewhat restricted but fairly appropriate."

8

On February 10, 2010, Murphy met again with Penick. Murphy reported that she "was planning to start another job, but decided it was too similar to the one she'd had, so she would like to start substitute teaching several days a week." (AR 297) Her mood and affect were "pleasant but also depressed and anxious." Her motivation was low and she was continuing "to have difficulty with focusing, as well as processing, information. Concentration is poor, although memory is good." (AR 297)

On March 8, 2010, Murphy met with Dick Socwell, M.S., a licensed psychologist at the Abbe Center. Murphy had been referred to Socwell by Penick for an ADHD evaluation. In looking at the characteristics for ADHD, Murphy endorsed only 8 of 25 items on the adult ADHD checklist, while a minimum of 12 is required to consider ADHD. (AR 294) Murphy was cooperative throughout the session although she was "a bit dysphoric" and her affect was "a bit flat." Socwell concluded that Murphy did not appear to have ADHD.

Murphy met with Penick on March 17, 2010 and reported feeling extremely depressed. She reported low motivation and energy, and stated that "she has been sleeping all day and now is off schedule." Murphy reported meeting with her family doctor, although he had not prescribed anything for ADHD. Penick opined that Murphy "continues to present with symptoms which meet that criteria." (AR 292-93)

On April 21, 2010, Murphy met with Dr. Mark W. Mittauer, M.D., a staff psychiatrist at the Abbe Center.[2] Murphy told Dr. Mittauer that she had been "consistently depressed since age 17." She described the current severity of her depression at about an 8 on a scale of 1 to 10. Murphy reported having erratic sleep patterns, and when depressed she has hypersomnia. Murphy reported that she has panic attacks that occur under stress. Murphy told Dr. Mittauer that she had been prescribed 40 mg of Fluoxetine a day, but in fact was taking 80 mg. Dr. Mittauer described her

---

[2] According to Dr. Mittauer's transfer note, Dr. Ekholm had left the Abbe Center.

speech and motor activity as "unremarkable." Her affect was "somewhat timid, sad, tearful, and appropriate." Her insight, impulse control, and social judgment were "deemed in tact." Dr. Mittauer prescribed Methylphenidate and decreased Murphy's prescription for Fluoxetine. (AR 290)

Dr. Mittauer saw Murphy again on June 11, 2010. Murphy was continuing to take Prozac and Ritalin.[3] Murphy told Dr. Mittauer that she feels "okay," but her depression persisted, she felt isolated, and had been overeating. (AR 285) Her brother was moving to Europe and she was having conflicts with her mother. It was decided that she would resume psychotherapy with Penick.

Murphy met with Penick on June 14, 2010. Her mood was "pleasant but depressed" and her affect was "somewhat restricted and unfocused." (AR 283) Murphy reported that "it has been difficult for her to get out of the house because of depression and anxiety." According to Murphy, she was "sleeping a lot." Penick discussed with Murphy the fact that she "has not been consisted with treatment," and "she was encouraged to begin taking her medication as prescribed in order to get maximum benefit." (AR 283) Murphy acknowledged that "the few times she has taken the Ritalin it seems to have helped somewhat." Murphy told Penick that "[s]he is not sleeping all the time now that she is on her current dose of Fluoxetine." It was decided to increase the frequency of Murphy's meetings with Penick to one every two weeks.

Two weeks later, on June 30, 2010, Murphy met again with Penick. Murphy reported that she "has not been doing very well, although she also has not been taking her medications on a regular basis as prescribed for any length of time." (AR 281) Her mood was pleasant and cooperative, and her affect was appropriate, although she spoke in a "soft

---

[3] Prozac is the brand name for fluoxetine and Ritalin is the brand name for methylphenidate.

tone and slowly." Murphy told Penick that "she still does not have any motivation to speak of and she becomes very overwhelmed by the idea of leaving the house."

Murphy met with Dr. Mittauer more than one month later, on August 6, 2010. Murphy reported that since the last meeting, she had been better able to take her medications on a consistent schedule. Murphy stated that with the Ritalin, she has more energy. According to Murphy, "[h]er depression persists in that it periodically flares." (AR 279) Murphy reported that she was "trying to eat healthy," but became frustrated when she "slips." Murphy reported, however, that she walked three times that week. She signed up to get a community support worker. "She is also very proud that she got up the course [sic] to go to her high school reunion which she enjoyed." Dr. Mittauer concluded that Murphy's "depression and anxiety have improved somewhat since we last met." (AR 280) Murphy did not report any significant anxiety, although she still had some fatigue and periodic suicidal thoughts.

Murphy was not seen again at the Abbe Center until December 22, 2010, when she met with Penick. Murphy was distressed by her sleep schedule, telling Penick that "she has her days and nights mixed up." (AR 276) According to Penick, Murphy's affect was incongruent with her mood. "Sandy presents as fairly cheerful and update [sic] when in fact she is not doing all that well emotionally." (AR 276) She continued to have low motivation and energy, and was still overeating and gaining a lot of weight, which she found very distressing. Nonetheless, Penick noted that she was neatly dressed and groomed, and her hygiene was good.[4]

Murphy met with Dr. Mittauer one week later, on December 29, 2010. Murphy reported that she had been having "good and bad days," with "more bad days than good." According to Dr. Mittauer's progress note, "[s]he attributed her down mood to not being

---

[4] Throughout the record, Murphy consistently appeared neatly dressed and groomed, without any concerns regarding her hygiene.

able to achieve her goals such as being able to make a living by writing." (AR 274) She was engaging in volunteer activities and had been somewhat more active, attending Bible study and mass. She was unhappy by gaining 100 pounds in a year by over-eating and sleeping too much and not exercising. In addition to Ritalin and Fluoxetine, Dr. Mittauer prescribed Trazodone as needed for insomnia.

On January 19, 2011, Murphy met with Penick. Murphy reported that the Trazodone "has been very helpful as her sleep is not as interrupted as previously." (AR 384) Nonetheless, Murphy remained depressed and stated that "there are some days she doesn't bother to get dressed and stays in bed most of the day." (AR 384) Murphy reported that her father had been ill and she was quite worried about him.

When Murphy met with Penick on March 2, 2011, she stated that "she has not been sleeping in as long and she plans to start walking again once the weather improves." (AR 382) She also acknowledged she was still sleeping "too much." According to Penick's progress note, Murphy "[s]till does not feel she would be able to work on a fulltime basis, although often makes reference to wanting to do this."

Murphy met with Penick two weeks later, on March 16, 2011. At that time, Murphy reported that "she has been getting out of bed every day and showering though she does not always get out of the house." (AR 379) She was still spending a lot of time on the computer and found it difficult to leave the house, although she was meeting with a church group once each week. Murphy and Penick discussed the status of Murphy's social security disability application, and Murphy reported that it was denied.

Dr. Mittauer met with Murphy on April 27, 2011. It was the first time he had seen her since December 29, 2010. Murphy reported being under stress because her father had died about one month earlier and her mother had a bout with pneumonia. Her depression had been "variable" and it increased when her father died. Murphy also stated that she thinks her mood worsens prior to her menses. Her panic attacks worsened when her father

died, but "[t]hey are now improved." Murphy reported walking two miles three times per week.

On May 2, 2011, Murphy met with Penick. Murphy had missed several appointments with Penick and expressed concern that Penick no longer wanted to see her. Penick assured Murphy that was not the case, although she would probably be required to attend a "no-show group" if she continued to miss sessions. (AR 375) Murphy reported that her "motivation continues to be on the low side and she still is over eating as well as sleeping too much." She was continuing to work on "trying to get out of the house."

On May 8, 2011, Murphy's community support worker, Tanya Moyle, completed a "Function Report" on a form provided by the Social Security Administration. Moyle reported meeting with Murphy one or two hours per week for about nine months. According to Moyle, Murphy had "severe depression at times, making it very difficult for her to follow through with even small tasks." (AR 218) According to Moyle's report, Murphy would sometimes go three or four days without bathing. Moyle opined that Murphy became "overwhelmed easily and shuts down."

On May 25, 2011, Myrna Tashner, Ed.D., performed a case analysis on Murphy's application to reconsider her claim. Citing progress notes from March 2011, Dr. Tashner concluded that Murphy "is motivated and an active participant in treatment." (AR 325) Dr. Tashner opined that Murphy

> has made significant progress with medication compliance and following through with therapy. Her mood was cooperative but somewhat anxious. She is still having problems with anxiety and depression but her motivation is improving and her energy is fair.

(Administrative Record at 325.) Dr. Tashner concluded that Murphy's initial denial of benefits in February 2011 "is affirmed as written."

When Murphy met with Penick on June 13, 2011, her affect was "somewhat brighter." Murphy noted that her application for social security benefits was denied, but

that she was working with an attorney on the appeal process. Murphy had planned and executed a garage sale which "went fairly well." Murphy stated, however, that "she still has had several days out of a week when she spent most of the [day] in bed because of depression." (AR 373) She had been able to walk several times a week for about two weeks, "but then her motivation quit and she has lost since." It was agreed that she would maintain weekly contact with her community support worker and would return to see Penick in four weeks.

Following the meeting on June 13, 2011, Penick filled out a "Mental Impairment Questionnaire" provided by Murphy's attorney. (AR 331-336) Penick described her clinical findings as "disturbance impairment in all aspects of daily living. Hampered by OCD and other anxiety manifestations." Penick opined that Murphy would be "unable to meet competitive standards" in maintaining regular attendance, sustaining an ordinary routine without special supervision, working in coordination with others without being unduly distracted, completing a normal work day and work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, getting along with co-workers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in routine work setting, dealing with normal work stress, and being aware of normal hazards and taking appropriate precautions. Penick also opined that Murphy would be "unable to meet competitive standards" regarding "adherence to basic standards of neatness and cleanliness." Regarding Murphy's functional limitations, Penick noted "extreme" restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Penick also opined that Murphy would suffer "four or more" "episodes of decompensation within 12 month period, each of at least two weeks duration." Finally, Penick stated that Murphy would be absent from work due to her impairments more than four days per month.

Penick and Murphy met on June 27, 2011. Murphy reported that she was "feeling less fatigued and motivation has improved somewhat," but she was obsessed about being overweight. (AR 371) When she met with Penick on July 25, 2011, Murphy was depressed and her affect was congruent with her mood. She was neatly groomed, however, and wearing makeup. (AR 369).

On August 8, 2011, Murphy met with Dr. Mittauer and then met with Penick. Murphy told Dr. Mittauer that the Ritalin helped improve her energy, focus, and motivation, and the higher dose of Prozac had also been helpful. (AR 367) She had acquired a pill organizer and was trying to be more consistent in taking her medications. She had returned to church and attended mass several times per week. She recently had lasik eye surgery. Dr. Mittauer found "[n]o significant depressive symptoms," although Murphy reported she still has panic attacks. (AR 367) She had been walking for exercise. Dr. Mittauer concluded that "[s]he continues to have some anxiety at times, but depression is much improved." (AR 268)

Fifteen minutes after meeting with Dr. Mittauer, Murphy met with Penick. Murphy told Penick that "[s]he has been walking 3 miles several times a week and she has also been attending Church which has improved her support system." (AR 365) Her mood was "cooperative" and her affect was described as "more full." Her motivation had improved. Murphy reported that "she still becomes quite anxious and finds it exhausting to be around people for very long and she is somewhat depressed, but she is no longer staying in bed all day." (AR 365)

Murphy was not seen again at the Abbe Center until December 28, 2011, when she met with Dr. Mittauer. Murphy reported that she had been "feeling pretty good," had resumed Bible study, and would complete the STEPPS class tomorrow. (AR 363) She stopped taking Ritalin for a while, but resumed it due to fatigue. She was trying to sleep less in the day so that she could sleep more at night. "She has been somewhat depressed

15

in the context of grief for her father," who had died about eight months earlier. (AR 363) She also reported having some panic attacks.

Three days later, on December 31, 2011, Dr. Mittauer completed a mental impairment questionnaire submitted by Murphy's attorney. Dr. Mittauer reported "some improvement in depression & anxiety, but symptoms persist." (AR 340) Dr. Mittauer also reported "persistent panic attacks and depression and fatigue and over sleep." Dr. Mittauer opined that Murphy would be "unable to meet competitive standards" regarding maintaining attention for two-hour segments, maintaining regular attendance and be punctual, sustaining an ordinary routine without special supervision, working in coordination with others without being unduly distracted, completing a normal workday and work week without interruptions from psychologically-based symptoms, performing at a consistent pace, getting along with co-workers without being unduly distracted, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (AR 342) Dr. Mittauer also opined that Murphy would be "unable to meet competitive standards" regarding understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals, and dealing with stress of semi skilled and skilled work. (AR 343) According to Dr. Mittauer, Murphy had "marked" restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Dr. Mittauer opined that Murphy would have four or more episodes of decompensation within a twelve-month period, each of at least two weeks duration, and would be expected to miss more than four days of work per month due to her impairments.

On January 31, 2012, Murphy met with Penick. She stated that "she sleeps most of the day because she is very lonely and becomes extremely depressed." (AR 361) She stated that out of 30 days, she took her medications for 17 days. She had stopped going

to mass and Bible study "because she felt extremely awkward socially." However, she had joined an online group called "memory people."

Murphy was next seen by Dr. Mittauer on May 7, 2012. Dr. Mittauer noted that Murphy had missed some appointments with him "because her symptoms recurred and this was because she missed some of her medication." (AR 357) Murphy reported that she had hypersomnia, isolative behavior, and had been avoiding going to her STEPPS group, although she did resume that recently. Murphy described her depression as severe and reported that she was having panic attacks. Dr. Mittauer noted that "[s]he states she feels very depressed although she doesn't look as depressed as she states she feels." (AR 358)

Approximately one month later, on June 9, 2012, Murphy was admitted to the hospital through the emergency room "with increasing depression and general dysfunction." (AR 347) Dr. Rickard K. Larsen, M.D., noted that Murphy was initially diagnosed with depression, but that upon further review "it became clear that the patient actually has schizophrenia." (AR 347) The antidepressant medication was discontinued and Murphy was prescribed Navane. Murphy was released from the hospital after nine days, on June 18, 2012. The discharge summary states that Murphy "reports feeling better than she has in years." (AR 348)

Murphy met with Penick again on July 16, 2012. Murphy told Penick that she voluntarily went to the hospital because she "couldn't take it anymore." (AR 359) Murphy reported side effects with taking Navane and, therefore, her prescription was changed back to Fluoxetine. She was not able to get Ritalin due to some problem with her medication assistance program.

The hearing before the ALJ was held on August 22, 2012.

## IV.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that Murphy is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.  *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g).  "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity.  If so, the claimant is not disabled.  Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months.  Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments.  If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled.  However, the

fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Murphy had not engaged in substantial gainful activity since January 7, 2010, the alleged onset date. At the second step, the ALJ concluded from the medical evidence that Murphy has the following severe impairments: attention deficit hyperactivity disorder (ADHD), major depressive disorder, generalized anxiety disorder/social phobia, personality disorder/obsessive compulsive disorder (eating disorder), and obesity. At the third step, the ALJ found that Murphy did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Murphy's RFC as follows:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except she can only perform simple, routine tasks, with simple, work-related decisions and few workplace changes, only brief, superficial interaction with the public and co-workers, and occasional interaction with supervisors.

(Administrative Record at 15.) Also at the fourth step, the ALJ determined that Murphy was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, work experience, and RFC, Murphy could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Murphy was not disabled.

### B. Objections Raised By Claimant

Murphy argues that the ALJ erred in two respects. First, Murphy argues that the ALJ failed to give good reasons for discounting the opinions of her treating psychiatrist, Dr. Mittauer. Second, Murphy argues that the ALJ failed to properly evaluate the opinions of her therapist, Karen Penick, and her CSP worker, Tanya Moyle.

### 1. Opinion of Treating Physician

Murphy first argues that the ALJ improperly discounted the opinions of Dr. Mittauer, without giving good reasons.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

The ALJ's analysis of Dr. Mittauer's opinions appears to be limited to a single paragraph:

> Dr. Mittauer found that in August 2011, the claimant felt like she was going in the right direction, and the medication had helped her improve her energy, focus, and motivation. She had no significant depressive symptoms, she walked for exercise, but did still have some panic attacks. Dr. Mittauer opined that the claimant had some anxiety at times, but her

depression was much improved. Although Dr. Mittauer opined in a December 2011 treating source statement that the claimant had marked restrictions in daily living, social functioning, and maintaining concentration, persistence, and pace, this does not reflect his previous treatment notes. (8F) Nor does it reflect the January 2012 treatment notes from the Abbe Center that indicated only "some" social withdrawal, denial of hopelessness or helplessness, and a cooperative but depressed mood. Further, the claimant was given a GAF of 55, indicating only moderate limitations. (10F/7) Therefore, the undersigned gives little weight to the treating source statement of Dr. Mittauer, but does give weight to his overall objective treatment notes. (Exhibits 8F, 10F)

(Administrative Record at 17.)

In deciding to give Dr. Mittauer's opinions "little weight," the ALJ seized on his progress note from August 2011. At that time, Murphy's condition was improved. While she was continuing to suffer from panic attacks, Dr. Mittauer found "no significant depressive symptoms." Murphy had returned to church and attended mass several times per week, and told Penick on that date that she had been walking three miles several times a week. In focusing on Murphy's condition on that date, however, the ALJ failed to "assess the record as a whole" to determine whether Dr. Mittauer's opinions were "inconsistent with substantial evidence on the record." *Travis*, 477 F.3d at 1041. Dr. Mittauer saw Murphy eight times between April 2010 and May 2012. Penick saw Murphy 20 times between February 2009 and July 2012. A review of their progress notes reflects that Murphy's symptoms waxed and waned during that time. While she was improved on some occasions, at other times she was unable to get out of bed due to her depression. The ALJ dismissed Murphy's 10-day hospitalization in June 2012 as "anomalous."

In his ruling, the ALJ states: "Notably, with the exception of Dr. Mittauer and Ms. Penick, the record does not contain any opinions from treating or examining physicians

indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (AR 19) That is hardly surprising, because Murphy was only being treated by a single psychiatrist and was only being counseled by a single therapist. To the extent the ALJ believed that a "second opinion" was required to establish Murphy's limitations, he could have ordered a consultative exam. An ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts v. Apfel*, 143 F.3d 1134, 1138 (8th Cir. 1998) (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)).

In his ruling, the ALJ then goes on to state that "[t]he clinical notes are internally consistent as well as consistent with the evidence as a whole. As there is no objective evidence contradicting the findings of the treating or examining physicians, the opinions are entitled to great weight." (AR 19-20) Nonetheless, the ALJ stated that he was giving "little weight" to Dr. Mittauer's opinions.

Because the ALJ focused primarily on a single visit in August 2011, rather than assessing the record as a whole to determine whether Dr. Mittauer's opinions were consistent with that record, the Court finds that the case should be remanded for further consideration of Dr. Mittauer's opinions. On remand, the ALJ must assess the record as a whole and give good reasons for accepting or rejecting the opinions of the treating physician.

### 2. Opinion of Counselor and Case Worker

Murphy also argues that the ALJ failed to properly evaluate the opinions of her therapist, Karen Penick, and her CSP worker, Tanya Moyle.

Karen Penick, a licensed social worker, is not classified as an "acceptable medical source" under the Social Security Regulations. Even though Penick is not an "acceptable

23

medical source," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination. On August 9, 2006, the SSA issued Social Security Ruling 06-03p. The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a social worker, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other medical evidence," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

In his ruling, the ALJ discussed the opinions of Moyle and Penick as follows:

> The third party function report completed by Tanya Moyle, the claimant's CSP worker, does not establish that the claimant is disabled. Since Ms. Moyle does not appear to be medically trained to make exacting observations as to dates, frequencies,

24

types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the testimony is questionable. In addition, great weight cannot be given to such third party statements because they, like the claimant's allegations, are not consistent with the objective medical evidence as a whole. (Exhibit 7E)

Karen Penick, LISW, MSW, completed a medical source statement about the claimant. Ms. Penick opined that the claimant had an anxiety disorder that would prevent her from functioning independently outside the home. She opined that the claimant would miss more than four days of work per month, and had extreme functional limitations in pace, social functioning, and activities of daily living. However, Ms. Penick also found the claimant was only seriously limited in her ability to interact in public, maintain socially acceptable behavior, travel, understand, remember, and carry out detailed instructions. She gave the claimant GAF scores between 53 and 55, indicating only moderate difficulties. Ms. Penick's opinion is not consistent with her own treatment notes as a whole. Similarly, the restrictions she placed upon the claimant are not supported by the medical evidence as a whole. It is also important to note that Ms. Penick is a non-acceptable medical source. Only acceptable medical sources can establish the existence of a medically determinable physical or mental impairment; give medical opinions; and be considered a treating source whose medical opinion may be entitled to controlling weight. (Exhibits 7F)

(Administrative Record at 19.)

As set forth above, the ALJ first discounts Moyle's opinions because she "does not appear to be medically trained to make exacting observations." He then concludes, rather summarily, that Moyle's observations are not consistent with the objective medical evidence as a whole. Similarly, the ALJ concluded that Penick's opinions were not consistent with her own treatment notes, seemingly ignoring those notes which reflect that Murphy was highly dysfunctional. Because this action will be remanded for further

consideration of the treating physician's opinions, the Court believes that the ALJ should also reconsider the opinions expressed by Murphy's therapist and case worker, when viewing all of the progress notes over the relevant time period.

## C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to fully and fairly develop the record with regard to Murphy's history of limitations due to mental health difficulties. Accordingly, the Court finds that remand is appropriate.

## V. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ is required to assess the record as a whole to

determine whether Dr. Mittauer's opinions are inconsistent with substantial evidence on the record.

## VI. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 26th day of _____September_____, 2014.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA